# In the United States Court of Federal Claims

No. 04-1665C

(Filed January 12, 2006)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * )<br>)<br>**NOVA CASUALTY COMPANY,** )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**UNITED STATES,** )<br>)<br>Defendant. )<br>)<br>* * * * * * * * * * * * * * * * * * * * * * * * * | Motions to dismiss; subject matter jurisdiction; suretyship; performance and payment bonds under the Miller Act; renovation and repairs of a U.S. Coast Guard light tower; equitable subrogation; sovereign immunity; necessity of notice to the government to stop payment to the contractor |

Neil B. Connelly, White Plains, NY, for plaintiff.

Dawn S. Conrad, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and James M. Kinsella, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Isaac Johnson, Jr., Attorney, Office of Procurement Law, United States Coast Guard, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This surety case stems from a contract entered between the United States Coast Guard ("Coast Guard") and Eagle Management Enterprises, Inc. ("Eagle") for the purpose of renovating the federally-owned Coney Island Light Tower in Brooklyn, New York. At the request of Eagle, the plaintiff, Nova Casualty Company ("Nova"), issued performance and payment bonds for the benefit of the United States as obligee. Eagle arguably defaulted on its obligation to provide a satisfactory renovation of the light tower and on its obligation to pay its subcontractors. Thus, both the performance and payment bonds were invoked against Nova.

Initially, in its original complaint, Nova sought to obtain the balance due Eagle from the Coast Guard and demanded a declaratory judgment in its favor discharging it of liability under the payment bond. The government moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). In response, Nova filed both an opposition to that motion and an Amended Complaint. In its Amended Complaint, Nova asserted two new claims, challenging a progress payment made by the government to Eagle in July 2003 as being improper and appealing a decision by the Contracting Officer to assess a claim against Nova, as the surety for Eagle, under the performance bond. The government filed a second motion to dismiss the amended complaint, asserting that the plaintiff had yet to establish subject matter jurisdiction and state a valid claim.

The court conducted a hearing on the government's motions on July 27, 2005. As a result of new factual developments that the parties disclosed for the first time at this hearing, the court requested that each party file supplemental briefs and materials to address the legal implications of these new facts. The supplemental submissions were filed in August and October 2005, and the pending motions are now ready for decision. For the reasons stated below, the government's motions to dismiss are granted in part and denied in part.

**BACKGROUND**[1]

On April 20, 2001, the Coast Guard issued Solicitation No. DTCGG101B3WK143 respecting a prospective contract to remove lead paint from, and to prepare and paint all exterior and interior surfaces of, the Coney Island Light Tower. Joint Filing of Supplemental Materials Pursuant to July 27, 2005 Court Order ("Supp. Materials") Ex. A (Prime Contract (Sept. 6, 2001)) at 1, 4. Other more minor repairs and renovations were to be made to the exterior facilities. *Id*. The Coast Guard ultimately awarded the contract, No. DTCGG1-01-C-3WK143, to Eagle on September 6, 2001 for a lump sum bid of $138,000. *Id*. at 1, 2. As a condition of receiving the contract, and pursuant to the Miller Act, Pub. L. No. 74-321, §1, 49 Stat. 793 (codified at 40 U.S.C. § 3131(b)) (formerly codified as 40 U.S.C. § 270a), Eagle obtained performance and payment bonds, designated as Bonds No. 18271, from Nova in the amount of $138,000, each for the benefit of the United States as obligee. Supp. Materials Ex. A at 20-21; Amended Compl. ¶ 9; *see* Plaintiff's Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp.") Ex. H (Performance Bond (Sept. 12, 2001)); Supp. Materials Ex. B (Payment Bond (Sept. 12, 2001)).

Eagle and Nova had previously signed a General Agreement of Indemnity in favor of Nova that included an assignment to Nova "of all Eagle['s] rights under any contract for which Nova issued its bonds, and on which Eagle . . . failed to complete its contract obligations, or

[1]The recitations that follow do not constitute findings of fact by the court. Rather, the recited factual elements are taken from the parties' filings and are either undisputed or alleged and assumed to be true for purposes of the pending motions.

otherwise caused a claim to be asserted against Nova's bonds." Amended Compl. ¶¶ 10-11; *see* Pl.'s Opp. Ex. B (General Agreement of Indemnity (Dec. 27, 2000)).

On June 28, 2002, Eagle entered into two subcontracts with Metron Environmental Limited ("Metron") to perform lead abatement, two coats of painting, and associated work on the light tower for $101,278.72. Amended Compl. ¶ 12; Compl. Ex. 1 (Complaint, *United States of America ex rel. Metron Environmental Limited v. Eagle Management Enterprises, et al.*, No. CV-03-1952 (E.D.N.Y. filed Apr. 23, 2003) ¶¶ 10-14). Eagle entered into a third subcontract with Harsco Corporation ("Harsco") for additional work to be performed under the Prime Contract. Plaintiff's Rebuttal to Defendant's Motion to Dismiss ("Pl.'s Rebuttal") at 7. On January 14, 2003, the Contracting Officer for the Coast Guard, Mr. John O'Boyle, informed Eagle that "the exterior painting work ha[d] been completed satisfactorily and [Eagle could] proceed with the removal of scaffolding," though "interior work and outside concrete work [wa]s still outstanding." Pl.'s Opp. Ex. A (Letter from John O'Boyle, Contracting Officer, Coast Guard, to Eagle (Jan. 14, 2003)).

After receiving complaints from the lightkeeper, the Contracting Officer visited the project site on June 20, 2003 and discovered "blotches" on the exterior of the light tower. Pl.'s Opp. Ex. C (Contracting Officer's Final Decision (Feb. 17, 2004)). The Coast Guard informed Eagle of "deficiencies in the exterior painting" of the light tower in letters dated June 27 and July 2, 2003, stating that such differences in color in certain areas of the light tower had not been apparent in earlier site visits. Supp. Materials Ex. C (Cure Notice (Nov. 18, 2003)). The principal of Metron, Vasilios Georgiadis, subsequently testified in a separate action that his company applied the paint for the light tower and that it was within the specifications issued by the Coast Guard in the Prime Contract. Amended Compl. ¶ 15; *see United States of America ex rel. Metron Environmental Limited v. Eagle Management Enterprises, et al.*, No. CV-03-1952 (E.D.N.Y. filed Apr. 23, 2003). On July 17, 2003, Eagle informed the Coast Guard that despite previous indications that it might repaint the entire light tower, it had decided only to repaint those areas that suffered from discoloration. Supp. Materials Ex. C (Cure Notice). By letters dated July 18 and 22, 2003, Mr. O'Boyle stated that this proposal would be acceptable so long as the ultimate result was satisfactory to the Coast Guard. *Id.* On October 20, 2003, Mr. O'Boyle faxed a letter to Eagle to request a meeting to discuss further Eagle's plans to return to the site and repaint certain portions of the light tower. *Id.* Despite assurances from Eagle that a meeting with the Coast Guard on October 30, 2003 would be acceptable, ultimately no representative from Eagle attended the meeting. *Id.*

Thereafter, on November 18, 2003, Mr. O'Boyle sent a Cure Notice to Eagle, with a copy to Nova, asking Eagle to confirm in writing within ten calendar days that Eagle intended to perform the additional painting. Supp. Materials Ex. C (Cure Notice). The Cure Notice could not be delivered, however, and Federal Express reported that the "'Customer was not available or [the] Business [was] closed.'" Supp. Materials Ex. D (Letter from O'Boyle to Eagle (Nov. 24, 2003)). On November 24, 2003, Mr. O'Boyle re-sent a copy of the letter to Eagle, by certified mail, also providing a copy to Nova. *Id.*

Eagle received the copy of the Cure Notice on December 1, 2003, but made no response to the Coast Guard. Pl.'s Opp. Ex. C (Contracting Officer's Final Decision). Consequently, on February 17, 2004, Mr. O'Boyle issued a final decision "that the Government shall have the repairs [on the light tower] performed by others with the resultant costs charged to [Eagle's] account and/or the account of [Eagle's] surety [Nova]" on the ground that Eagle's failure to perform the corrective repainting was "not excusable." *Id*. Furthermore, he stated that Eagle could appeal this decision to either the Department of Transportation Board of Contract Appeals or the U.S. Court of Federal Claims. *Id*. A copy of the final decision was also sent to Nova. *Id*.

On September 23, 2004, the Coast Guard awarded a contract to Verrazano Contracting Company, Inc. ("Verrazano") for $22,805 to perform the additional painting on the light tower. Pl.'s Opp. Ex. D (Letter from O'Boyle to Nova (Oct. 8, 2004)). Mr. O'Boyle informed Nova that once the painting was completed the Coast Guard would seek repayment of the contract price with Verrazano both from Eagle and from Nova in its capacity as Eagle's surety under the performance bond. *Id*. Furthermore, Mr. O'Boyle informed Nova that despite his previous belief that $30,676.50 remained in the Eagle contract account, only $5,373 existed due to the fact that the Coast Guard had improperly paid Eagle $25,303.50 in July 2003 without his authorization. Pl.'s Opp. Ex. E (Letter from O'Boyle to Neil B. Connelly, counsel for Nova (Nov. 26, 2004)).[2]

Verrazano completed its contract, and the Coast Guard ultimately paid Verrazano $23,898.50 on or about December 1, 2004. Pl.'s Opp. Ex. I (Contracting Officer's Final Decision (Feb. 14, 2005)). Afterwards, Mr. O'Boyle issued a second final decision and submitted a claim to Eagle and Nova, as Eagle's surety, for $22,245.05, based on the difference between the costs of repainting the light tower and certain inspections, and the remaining contract balance. *Id*. As in his previous final decision, Mr. O'Boyle recited the means by which Eagle could appeal this second final decision and also mailed copies to Nova and its counsel. *Id*. On March 4, 2005, Nova's counsel wrote Mr. O'Boyle objecting to his second final decision and the improper installment payment to Eagle. Pl.'s Opp. Ex. F (Letter from Connelly to O'Boyle (Mar. 4, 2005)).

On April 23, 2003, Metron filed a complaint against Eagle and Nova, as Eagle's surety, in the U.S. District Court for the Eastern District of New York based on Eagle's failure to pay Metron $67,278.72 under its two subcontracts. Defendant's Motion to Dismiss ("Def.'s Original Mot.") App. at 6-13 (Docket for No. CV-03-1952 (Mar. 4, 2005)); *see United States of America ex rel. Metron Environmental Limited v. Eagle Management Enterprises, et al.*, No. CV-03-1952 (E.D.N.Y. filed Apr. 23, 2003). Nova ultimately paid Metron $58,000 upon the payment bond in full and final settlement of Metron's claim against Nova. Plaintiff's Supplemental Brief in

[2] In total, the Coast Guard paid Eagle $132,627 in five partial payments against the contract price of $138,000. Pl.'s Opp. Ex. I (Contracting Officer's Final Decision (Feb. 14, 2005)).

Opposition to Defendant's Motion to Dismiss ("Pl.'s Supp.") Ex. A (Stipulation of Settlement (August 9, 2005)).[3]

Harsco also filed a suit against Eagle and Nova for failing to receive payment under its subcontract. Pl.'s Rebuttal at 9; *see United States of America ex rel. Harsco Corporation, Patent Construction Systems Division v. Nova Casualty Company, et al.,* No. CV-03-2959 (E.D.N.Y. filed June 16, 2003). On May 5, 2005, Nova and Harsco entered into a settlement whereby Nova paid Harsco $50,000 upon the payment bond in exchange for a release of Harsco's pending claim. Pl.'s Rebuttal at 11, Ex. A (Check No. D0088985 (Apr. 27, 2005)).

The payments by Nova to Metron and Harsco satisfied all outstanding claims against the payment bond issued by Nova for Eagle under the Prime Contract. Pl.'s Supp. at 2. Nova has never claimed that it has paid any money upon the performance bond.

On August 19, 2004, as part of the *Metron* litigation pending in the District Court for the Eastern District of New York, Nova filed a third-party complaint against the Coast Guard for reimbursement and indemnification with respect to Metron's then-pending claims. Pl.'s Rebuttal at 9; *see* Def.'s Original Mot. App. at 6-13 (Docket for No. CV-03-1952). Thereafter, Nova and the government stipulated to a voluntary dismissal of the third-party complaint without prejudice. Def.'s Original Mot. App. at 1-3 (Stipulation and Order of Dismissal of Third-Party Complaint (Nov. 5, 2004)).

Subsequently, Nova filed its original complaint in this court on November 10, 2004.

**STANDARD FOR DECISION**

As a threshold matter, jurisdiction must be established before the court may proceed with this or any other action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998). The plaintiff, Nova in this case, bears the burden of establishing that the court has subject matter jurisdiction over its claims. *See McNutt v. General Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). The court must accept all the facts as they are presented in the complaint as true and "draw all reasonable inferences in plaintiff's favor" when determining whether subject matter jurisdiction exists in a particular action. *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). The court must deny the government's motion if the undisputed facts in the complaint reveal any possible basis on which the plaintiff might prevail. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

---

[3]In the *Metron* action, a cross claim by Eagle against Metron for breach of contract remains pending before the District Court for the Eastern District of New York.

"All federal courts are courts of limited jurisdiction." *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed. Cir. 1998). The U.S. Court of Federal Claims is no exception. This court has jurisdiction over a claim brought against the United States only if Congress has consented through a waiver of sovereign immunity. *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003); *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Such a waiver "must be unequivocally expressed in statutory text . . . and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34, 37 (1992); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990)). "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane*, 518 U.S. at 192 (citing *United States v. Williams*, 514 U.S. 527, 531 (1995); *Library of Congress v. Shaw*, 478 U.S. 310, 318 (1986)).

The Tucker Act constitutes explicit consent for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Alone, however, the Tucker Act is insufficient to confer subject matter jurisdiction. The plaintiff must also identify a substantive right that is enforceable against the United States for money damages. *Mitchell*, 463 U.S. at 216-17; *see United States v. Testan*, 424 U.S. 392, 398 (1976). Should a court find that it lacks jurisdiction to decide a case on its merits, the court would be required either to dismiss the action as a matter of law, *see Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868); *Thoen v. United States*, 765 F.2d 1110, 1116 (Fed. Cir. 1985), or to transfer it to another federal court that would have jurisdiction. *See Gray v. United States*, __ Fed. Cl. __, __, 2005 WL 3320096, at **7-8 (Dec. 6, 2005).[4]

---

[4]In the present case, extrinsic materials were submitted in addition to the parties' pleadings. Further, the court requested supplementation of the record by its Order of July 27, 2005, because jurisdictional facts had been put at issue during a hearing conducted on that date. Order of July 27, 2005; *see also* Hr'g Tr. 76:20 to 77:21 (July 27, 2005). The facts as alleged in a plaintiff's complaint are normally considered "to be true and correct" for the purposes of evaluating a defendant's motion to dismiss for lack of subject matter jurisdiction. *Reynolds*, 846 F.2d at 747 (citing *Scheuer*, 416 U.S. at 236)). "But when a question of the [court's] jurisdiction is raised, either by a party or by the court on its own motion, . . . the court may inquire by affidavits or otherwise, into the facts as they exist." *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947) (citing *Wetmore v. Bymer*, 169 U.S. 115, 120 (1898)); *see Reynolds*, 846 F.2d at 747; *Ware v. United States*, 57 Fed. Cl. 782, 783 n.1 (2003).

The procedure to reach a determination of facts on an issue of jurisdiction "is left to the trial court," *Land*, 330 U.S. at 735 n.4 (quoting *Gibbs v. Buck*, 307 U.S. 66, 71-72 (1939)), and the court has exercised that discretion in this instance by requiring submission of additional documentary materials. Receipt of testimonial evidence has not been necessary.

## ANALYSIS

A. Nova's Appeal from the Contracting Officer's Final Decision of February 14, 2005

The second cause of action in Nova's Amended Complaint is an appeal of the Contracting Officer's Final Decision dated February 14, 2005. Amended Compl. ¶¶ 30-40; *see* Pl.'s Opp. Ex. I (Contracting Officer's Final Decision). The government contends that Nova lacks standing to appeal this final decision because Nova was not a party to the Prime Contract with the government. Defendant's Motion to Dismiss Amended Complaint and Reply in Support of Motion to Dismiss ("Def.'s Renewed Mot.") at 8-11.

The Contract Disputes Act ("CDA"), Pub. L. No. 95-563, 92 Stat. 2383 (1978) (codified at 41 U.S.C. §§ 601-613), provides a basis for jurisdiction over certain contractually related claims in this court because the CDA has been incorporated into the Tucker Act. *See* 28 U.S.C. § 1491(a)(2) ("The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act . . . on which a decision of the contracting officer has been issued under section 6 of that Act."). After the receipt of a contracting officer's final decision, pursuant to Section 6 of the CDA, codified at 41 U.S.C. § 605, a contractor may appeal either to a board of contract appeals, *id*. § 606, or directly to the U.S. Court of Federal Claims pursuant to Section 10(a)(1) of the CDA. *Id*. § 609(a)(1).

Under the CDA, a contractor is defined as "a party to a Government contract other than the Government." 41 U.S.C. § 601(4). This definition has been applied with precision. Among other things, third-party beneficiaries have been held *not* to be contractors for purposes of the CDA. *JGB Enters., Inc. v. United States*, 63 Fed. Cl. 319, 331 (2004) ("Because a third-party beneficiary is not a party to a contract, it is *not* a 'contractor' as defined in section 601 of the CDA, and [it] cannot assert a claim under the CDA.") (emphasis added). The related question in this case is whether a surety to a contractor is a contractor within the meaning of the CDA.

While Eagle and the federal government are parties to the Prime Contract, Nova is not. Supp. Materials Ex. A. Nova's declaration in its filings that there existed "an express contract" between itself and the United States under the performance bond, Pl.'s Rebuttal at 19 (referring to the Amended Complaint), is untenable and incorrect. The bonding contracts run between Eagle and Nova. *See* Pl.'s Opp. Ex. H (Performance Bond) (setting out an executed bond between Eagle and Nova). The government was not a party to that agreement, and therefore the surety agreement would fall outside the scope of the CDA. *See United States v. Seaboard Sur. Co.*, 817 F.2d 956, 961 (2d Cir. 1987); *see also Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 500 (Fed. Cir. 1990) ("The requirement for payment and performance bonds on contracts like [a contract subject to the Miller Act] does not . . . imply a contract between the government and the bondsman."); *Universal Sur. Co. v. United States*, 10 Cl. Ct. 794, 800-801 (1986) (holding that a surety is not a party to a construction contract, "and therefore not a 'contractor' under [the] CDA").

Correlatively, the Contracting Officer's Final Decision of February 14, 2005 was issued against Eagle, not Nova. Pl.'s Opp. Ex. I (Contracting Officer's Final Decision) at 1. Throughout the decision, use of the terms "you" and "your firm," were directed only to Eagle.[5] *Id*. at 1-2 ("The subject contract was awarded to *your firm* on 6 September 2001 . . . . The contract required that *you* complete all work . . . . The unpaid funds remaining in *your* contract were not sufficient to pay for the corrective work.") (emphasis added). Nova and its counsel received a copy of the decision, but only "[b]ecause of [Eagle's] failure to accept previous correspondence from the Coast Guard," not because Nova was a party to the decision. *Id*. at 3.

In these circumstances, the plain language of the CDA indicates that only Eagle, as the "party to a Government contract [*e.g.*, the Prime Contract] other than the Government," would have standing to appeal the Final Decision of the Contracting Officer to this court, not Nova. 41 U.S.C. § 601(4). As a surety, Nova is thus akin to a subcontractor with respect to the CDA, which cannot bring claims directly against the government but rather has to proceed against the prime contractor.[6] The situation would be different if Nova had entered into a takeover agreement or other contract with the federal government, because Nova would then be considered a "contractor" under Section 2(4) of the CDA, 41 U.S.C. § 601(4). *See* Def.'s Renewed Mot. at 8.

Consequently, because only a "party to a Government contract other than the Government" has standing to appeal a contracting officer's final decision pursuant to 41 U.S.C. §§ 606, 609, and in this case only Eagle can be classified as such a contractor, Nova is precluded from asserting any rights under the CDA with respect to the Final Decision of February 14, 2005.

This result accords with those reached in a number of decisions by the Federal Circuit holding that a surety cannot appeal a contracting officer's final decision to a board of contract appeals because subject matter jurisdiction is absent. In *Admiralty Construction, Inc. by National American Insurance Co. v. Dalton*, 156 F.3d 1217 (Fed. Cir. 1998), the court of appeals held that a performance and payment surety, which did nothing under its performance bond

---

[5]Mr. O'Boyle also referred back to his first Final Decision that was issued on February 17, 2004 in which he concluded that *Eagle's* "failure to perform corrective work [wa]s not excusable." Pl.'s Opp. Ex. C (Contracting Officer's Final Decision) at 3. Nova, as Eagle's surety, was mentioned in the first Final Decision, but only in reference to the fact that the government might charge Nova's account for the costs of contracting with a new company to perform the additional painting. *Id*.

[6]The legislative history of the CDA indicates that the government expressly intended that a "single point of contact" be held responsible, that being the prime contractor. S. Rep. 95-1118, at 16-17 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5235, 5250-51 (explaining the value of "administering [the government's] procurement through a single point of contact" and thus "specifically" excluding subcontractors from the provisions of the CDA, despite the possibility of "some inequities . . . with respect to the treatment of subcontractor claims").

except offer a replacement contractor and provide it with new bonds, could not appeal a contracting officer's decision under the CDA even where the surety sought relief on behalf of the original contractor. *Id*. at 1221-22. The court noted that the plaintiff-surety neither executed a takeover agreement with the federal government nor was the government a party to the surety agreement formed between the contractor and the surety. *Id*. at 1220-21 (citing *Carchia v. United States*, 485 F.2d 622, 628-29 (Ct. Cl. 1973)). "These disabilities prevent [the surety] alone from appealing the contracting officer's final decision." *Admiralty Constr.*, 156 F.3d at 1221; *see Seaboard Sur. Co.*, 817 F.2d at 961-62 (determining that the CDA "does not apply to a bond issued by a surety to a contractor" and thus only "vests jurisdiction in the claims court over claims arising from government contracts when such claims involve, as parties, the contractors themselves."). The Federal Circuit has extended this line of cases by holding that a surety could not appeal a contacting officer's decision to a board of contract appeals with respect to activities that occurred before a takeover agreement. *United Pac. Ins. Co. v. Roche*, 380 F.3d 1352, 1355-56 (Fed. Cir. 2004); *Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1350-52 (Fed. Cir. 2002).

Nova seeks to enhance its position by arguing that the General Agreement of Indemnity into which it entered with Eagle provides Nova with standing to appeal the Final Decision because Eagle voluntarily subrogated its rights under the Prime Contract to Nova. Pl.'s Opp. at 13, Ex. B. The statutory provisions of the Assignment of Contracts Act and the Assignment of Claims Act, however, nullify the plaintiff's argument. Under the Assignment of Contracts Act, 41 U.S.C. § 15(a), any "contract or order, or any interest therein" is barred from being "transferred by the party to whom such contract or order is given to any other party . . . so far as the United States is concerned," absent acceptance of the assignment by the United States. Further, pursuant to the Assignment of Claims Act, 31 U.S.C. § 3727, an assignment of any part of any claim against the United States "may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued." 31 U.S.C. § 3727(b). Together, these two statutes "prohibit . . . transfers of contracts involving the United States or interests therein, and assignments of claims against the United States," except that "such claims may be assigned 'only after' they have been allowed in a specific amount and provisions made for their payment." *Fireman's Fund*, 313 F.3d at 1349. Eagle's assignment of its rights in paragraph 8 of its General Agreement of Indemnity with Nova falls within these Acts. *See* Pl.'s Opp. Ex. B ¶ 8 ("in the event any such bond be given in connection with a contract . . . for construction work . . . [Eagle] further agrees in the event of any breach or default on [its] part in any of the provisions of said contract and/or bond that [Nova], shall be subrogated to all the rights . . . of [Eagle] in such contract "). Such an assignment contravenes both 31 U.S.C. § 3727 and 41 U.S.C. § 15(a), because Eagle's interests and rights could not be assigned nor had any claims against the United States arisen when the agreement was entered into on December 27, 2000. Finally, none of the exceptions in either statute are applicable to validate the General Agreement of Indemnity between Eagle and Nova. *See Fireman's Fund*, 313 F.3d at 1349-50 (finding that a surety is not a "bank, trust company, or financing institution" and thus an "assignment of a government contract to a surety [is] invalid") (citing *Royal Indemnity Co. v. United States*, 93 F. Supp. 891, 894 (Ct. Cl. 1950)); *see also Rochester Gas and Elec. Corp. v.*

*United States*, 65 Fed. Cl. 431, 437-38, 440-41 (2005) (concluding that a specific provision in the Nuclear Waste Policy Act, 42 U.S.C. § 10222(b)(3), permitted assignments of contracts and of claims notwithstanding the terms of the Assignment of Contracts Act or the Assignment of Claims Act).

Accordingly, Nova does not have standing to appeal the Contracting Officer's Final Decision of February 14, 2005, and consequently this court does not have jurisdiction over any claim based upon such an appeal.

B. Nova's Invocation of Equitable Subrogation as a Basis for Jurisdiction Under the Tucker Act

If a surety is unable to rely on privity of contract to establish the basis of a claim against the government, it traditionally invokes the doctrine of equitable subrogation as an alternative jurisdictional predicate. In effect, the surety relies upon equitable subrogation to step into the shoes of the contractor for purposes of the jurisdictional provisions of the Tucker Act, 28 U.S.C. § 1491(a). *See Insurance Co. of the West v. United States*, 243 F.3d 1367, 1373 (Fed. Cir. 2001) ("Neither the Federal Tort Claims Act nor the Tucker Act is limited to claims asserted by the original claimant."). A surety thus may be able to bring a suit based on the Tucker Act where it may not be able to pursue a claim under the CDA.

"'The right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties.'" *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 137 n.12 (1962) (quoting *Memphis & L.R.R. v. Dow*, 120 U.S. 287, 301-302 (1887)). "[P]robably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *Pearlman*, 371 U.S. at 136-37. Jurisdictionally, the question before the court is whether Nova may apply the doctrine of equitable subrogation as the basis of its claims against the government. *See* Def.'s Renewed Mot. at 12.

The line of cases detailing the rights of sureties to assert equitable subrogation against the federal government stretches back over one hundred years. In *Prairie State Nat'l Bank of Chicago v. United States*, 164 U.S. 227 (1896), the Supreme Court held that a plaintiff-surety could apply equitable subrogation in seeking retained funds from the government for completing performance of a government contract under a performance bond. The Supreme Court extended this reasoning in *Henningsen v. United States Fid. & Guar. Co.*, 208 U.S. 404 (1908), concluding that the surety of a government contractor could assert equitable subrogation on its claim to a remaining contract balance after the surety fulfilled its obligation under a payment bond by satisfying all outstanding claims by subcontractors of nonpayment. Thus, it has become axiomatic that "[a] surety can establish a right of subrogation in either of two ways: by completing the contract pursuant to its obligation under the performance bond or by paying off

materialmen's claims brought under the payment bond." *Transamerica Premier Ins. Co. v. United States*, 32 Fed. Cl. 308, 312 (1994).

The Supreme Court modified the rights of sureties of government contractors to equitable subrogation under payment bonds in *United States v. Munsey Trust Co.*, 332 U.S. 234 (1947). In *Munsey Trust*, after the contractor completed performance under the contract but failed to pay its subcontractors, the surety fulfilled its obligations under the payment bond and sought reimbursement by requesting the remaining funds in the contract balance retained by the government. *Id*. at 237. Prior to releasing the retained funds to the surety, the government deducted a portion of the amount based on an unrelated debt between the contractor and the government. *Id*. at 238. The surety objected to the setoff, but the Supreme Court held that the government's actions were proper as the surety's rights, based entirely on its performance under the payment bond, were inferior to the government's claims as a creditor of the contractor. *Id*. at 239-40. After the government had satisfied the debt to which it was owed, the surety would be eligible for any retained funds that remained. *Id*.[7]

Fifteen years after *Munsey Trust*, the Supreme Court in *Pearlman* again addressed the rights of a surety to a government contractor. *Pearlman* concerned a surety's right to subrogation after fulfilling its obligations under a payment bond issued pursuant to the Miller Act. In *Pearlman*, the Court held that the enactment of the Miller Act did not change the law of equitable subrogation as explicated in the *Prairie State* and *Henningsen* decisions. *Pearlman*, 371 U.S. at 139-40. The Court also held that *Munsey Trust* did not curtail those decisions but rather "left the rule in *Prairie Bank* and *Henningsen* undisturbed." *Id*. at 141. The facts in *Pearlman* were very similar to the facts in the instant case in that a surety did not complete performance but instead satisfied its obligations under the payment bond. The Court concluded that the surety was entitled to the funds that the government retained and in which the government's only role was that of a stakeholder. *Id*.

The application of the doctrine of equitable subrogation for sureties has long been recognized in this court, its predecessors, and the Federal Circuit. *See Balboa Ins. Co. v. United*

---

[7]The *Restatement (Third) of Suretyship and Guaranty* has rejected what has been described as the "*Munsey Trust* doctrine" whereby an obligee attempts to set off a claim against the principal obligor that arises out of a separate transaction against the secondary obligor's claim to the return performance obtained through subrogation. *See Restatement (Third) of Suretyship and Guaranty* § 31 cmt. d (1996). The *Restatement* took this position to prevent unjust enrichment: "If, upon performance by the secondary obligor, the obligee were allowed to set off the separate claim against the secondary obligor's subrogation rights, the principle obligor would be unjustly enriched because the performance by the secondary obligor would free the principal obligor of two claims – its duty pursuant to the underlying obligation and its duty pursuant to the separate claim." *Id*. Thus, there is an important divergence between the commonly applicable law as expressed in the *Restatement (Third) of Suretyship and Guaranty* and that applicable to government contracts as reflected in the *Munsey Trust* decision.

*States*, 775 F.2d 1158, 1160-61 (Fed. Cir. 1985); *United States Fid. & Guar. Co. v. United States*, 475 F.2d 1377, 1382 (Ct. Cl. 1973). In *U.S. Fidelity & Guaranty*, the Court of Claims took note of the Supreme Court's decisions in *Pearlman* and *Munsey Trust* and gave effect to *Pearlman* by holding that a surety that satisfied a payment bond was subrogated both to the rights of the contractor and to the rights of the subcontractors:

> [T]he surety was entitled to the benefit of *all* the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid. *The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen* who might have superior equitable rights to the retainage but no right to sue the defendant.

*U.S. Fid. & Guar.*, 475 F.2d at 1382 (emphasis added).[8] It concurrently applied *Munsey Trust* by distinguishing between the priority of a surety that paid on a performance bond and one that paid on a payment bond. 475 F.2d at 1383. The court concluded that while a surety that performed under a performance bond held a superior claim to retained funds over any claim asserted by the government, a surety that performed under a "payment bond, however, does not have priority when the United States is asserting a[n] . . . obligation owed by the prime contractor." *Id.*; *see also National Fire Ins. Co. of Hartford v. Fortune Constr. Co.*, 320 F.3d 1260, 1270-72 (11th Cir. 2003) (distinguishing between the relative superiority of a surety's right to subrogation under the performance and payment bonds, respectively) (citing *Dependable Ins. Co. v. United States*, 846 F.2d 65, 67 (Fed. Cir. 1988)); *Trinity Universal Ins. Co. v. United States*, 382 F.2d 317, 318-21 (5th Cir. 1967)).

Accordingly, a surety that performs under a payment bond is subrogated to the rights of *both* the party who owed the debt, the contractor, and the party to whom the debt was owed, the subcontractor. Such a surety is thus entitled to any funds retained by the government under the contract but only after the government has satisfied any claims it might possess as a superior creditor. A surety in this position may invoke the Tucker Act as a jurisdictional predicate for a suit against the government because it stands in the shoes of the contractor for that purpose.

C. Nova's Averred Right to Equitable Subrogation

Nova avers that it has satisfied all outstanding claims against the payment bond under the Prime Contract as a result of its $58,000 payment to Metron and $50,000 payment to Harsco. *See supra* at 4-5. Absent a viable allegation of full performance under the payment bond, the surety would be unable to invoke the doctrine of equitable subrogation. In *U.S. Fidelity & Guaranty*, the Court of Claims held that until the plaintiff-surety had "undertake[n] to pay all of

---

[8] *See also Universal Bonding Ins. Co. v. Gittens and Sprinkle Enters., Inc.*, 960 F.2d 366, 374-76 (3d Cir. 1992) (agreeing with the reasoning of the Court of Claims in *U.S. Fidelity & Guaranty*).

the outstanding claims owed by the" contractor, it would "not be permitted to share" in retained funds still held by the government. 475 F.2d at 1381 (citing *American Sur. Co. v. Westinghouse Elec. Mfg. Co.*, 296 U.S. 133, 136 (1935); *North Denver Bank v. United States*, 432 F.2d 466 (Ct. Cl. 1970)); *see also Balboa*, 775 F.2d at 1161. Nova has satisfied this threshold requirement for asserting equitable subrogation under a payment bond, and it contends that it has a valid claim to both the funds that the government has retained and those that were improperly paid to Eagle in July 2003.[9] The government continues to retain $5,373, Amended Compl. ¶ 21, and the Contracting Officer admits the Coast Guard improperly paid $25,303.50 to the contractor. Pl.'s Opp. Ex. E (Letter from O'Boyle to Connelly (Nov. 26, 2004)); Amended Compl. ¶¶ 27-29; *see* Pl.'s Rebuttal at 13.

The government responds that Nova's payments to the subcontractors pursuant to the payment bond are not sufficient to establish a claim for equitable subrogation that is cognizable in this court. Def.'s Supp. at 7-15, 24. The government contends that, although the United States has waived its sovereign immunity for such subrogation claims based upon fulfillment of a performance bond, it has not waived its sovereign immunity regarding subrogation claims arising out of a surety's satisfaction of its obligations under a payment bond. *Id*. Furthermore, the government contends that even if this court has subject matter jurisdiction to entertain Nova's claims, because Nova did not provide notice to the government to stop all payments to the contractor, Nova has failed to state a claim upon which relief can be granted. Def.'s Renewed Mot. at 18.

1. *Sovereign immunity.*

For its arguments respecting sovereign immunity, the government relies upon *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999), and *Insurance Co. of the West*, 243 F.3d 1367. In *Blue Fox*, a government contractor did not pay its subcontractor what it was owed and subsequently the subcontractor sued the government directly. 525 U.S. at 258.[10] The Supreme Court specifically addressed the rights of subcontractors and other creditors to sue the federal government and unanimously held that the doctrine of "sovereign immunity bars subcontractors

---

[9]Nova has never claimed that it paid any money or otherwise performed under the performance bond. *See* Defendant's Supplemental Brief in Support of its Motion to Dismiss the Amended Complaint ("Def.'s Supp.") at 4; Def.'s Renewed Mot. at 14. Furthermore, it has never asserted that it completed any portion of the contract prior to Verrazano's participation or that it ever entered into a takeover agreement with the government. *Id*. Consequently, Nova cannot assert the doctrine of equitable subrogation under the performance bond for any claim against the government.

[10]Based on the facts in *Blue Fox*, the subcontractor obtained a default judgment against the contractor in tribal court, but only decided to sue the federal government directly when it determined that it would be unable to satisfy that judgment from the contractor or its officers. *Blue Fox*, 525 U.S. at 258.

and other creditors from enforcing liens on Government property or funds to recoup their losses." *Id*. at 265. The subcontractor unsuccessfully argued in *Blue Fox* that *Prairie State*, *Henningsen*, and *Pearlman* suggested that subcontractors could seek compensation directly from the government. 525 U.S. at 264. The Supreme Court rejected this argument and concluded that none of these cases involved questions of sovereign immunity or claims by subcontractors directly against the government. *Id*. at 265.

Based on *Blue Fox*, the government argued in *Insurance Company of the West* that the Federal Circuit should "no longer rely on [*Prairie State*, *Henningsen*, and *Pearlman*] to find a waiver of sovereign immunity" for claims based upon the doctrine of equitable subrogation. 243 F.3d at 1371-72. The Federal Circuit first noted that "[t]here was nothing particularly novel about the . . . holding in *Blue Fox*." *Insurance Co. of the West*, 243 F.3d at 1371.[11] It agreed that the *Prairie State*, *Henningsen*, and *Pearlman* decisions by the Supreme Court had not addressed waiver of sovereign immunity in the context of equitable subrogation. Nonetheless, the Federal Circuit held that the Tucker Act provided such a waiver because "a subrogee, *after stepping into the shoes of a government contractor*, may rely on the waiver of sovereign immunity in the Tucker Act," 28 U.S.C. § 1491. *Insurance Co. of the West*, 243 F.3d at 1375 (emphasis added). In *Insurance Company of the West*, the surety of a contractor had financed completion of a government contract and sued the government directly to recover the remaining funds. *Id*. at 1369. Accordingly, because of the Tucker Act, "sovereign immunity represents no barrier" to an action by a subrogee against the government notwithstanding the Supreme Court's decision in *Blue Fox*. *Id*.

In the present case, the government reiterates its argument that *Prairie State*, *Henningsen*, and *Pearlman* do not provide a surety with an enforceable right to seek relief against the government through reliance on fulfillment of its duties under a bond, but here on a payment bond rather than a performance bond. *See* Def.'s Supp. at 17-18. In that respect, the government relies on dicta in the opinion for the Federal Circuit in *Insurance Company of the West* about the rights inhering in a surety on a payment bond: "It is well-established that a surety who discharges a contractor's obligation to pay subcontractors is subrogated only to the rights of the subcontractor. Such a surety does not step into the shoes of the contractor and has no enforceable rights against the government." *Insurance Co. of the West*, 243 F.3d at 1371 (citing *Munsey Trust*, 332 U.S. at 240-41); *see* Def.'s Supp. at 13. The government asserts that this language by the Federal Circuit bars a surety who has only satisfied claims under the payment bond, but failed to perform under the performance bond, from seeking relief directly from the government. Def.'s Supp. at 13. The emphasis that the government applies to this dicta from the Federal Circuit's opinion, however, is misplaced.

---

[11]In *United Elec. Corp. v. United States*, 647 F.2d at 1082, 1083 (Ct. Cl. 1981), the Court of Claims, relying on precedents in the Supreme Court and the Court of Claims, held twenty years before *Blue Fox* that subcontractors may not sue the government directly for their compensation.

The language quoted from *Insurance Company of the West* is correct insofar as it describes the relationship between a surety on a payment bond and subcontractors, but it is incomplete. It does not describe such a surety's connection also with the contractor. *See Insurance Co. of the West v. United States*, 55 Fed. Cl. 529, 538 (2003), *on remand from Insurance Co. of the West*, 243 F.3d 1367; *see also Restatement (Third) of Suretyship and Guaranty* §§ 27, 28(1)(a). A surety that discharges all of its obligations under the payment bond is subrogated not only to the rights of the subcontractors whom it has paid, but also to the rights of the party whose debts the surety has satisfied, namely the contractor. *See, e.g., Restatement (Third) of Suretyship and Guaranty* § 27 Ill. 3. The law within the Federal Circuit has long recognized the dual nature of a payment-bond surety's equitable subrogation to the contractor whose obligation it has satisfied as well as to the subcontractors whom it has paid. *See Balboa*, 775 F.2d at 1161; *United Electric*, 647 F.2d at 1086; *U.S. Fid. & Guar.*, 475 F.2d at 1382. In *Insurance Company of the West*, the Federal Circuit simply did not address this second aspect of subrogation under a payment bond. That mere omission could not have the effect of superseding the Supreme Court's decisions in *Henningsen* and *Pearlman* and numerous prior precedents of the Federal Circuit and Court of Claims. *See Pearlman*, 371 U.S. at 141 (rejecting the notion that the Court in *Munsey Trust* "so casually overruled" the "firmly established rule" from *Prairie State* and *Henningsen*).[12]

In addition, in *Insurance Company of the West*, the Federal Circuit noted in dicta that "*Balboa* correctly states the law of equitable subrogation . . . [and that] *Pearlman* stands for the proposition that the subrogee steps into the shoes both of the contractor . . . and the government." *Insurance Co. of the West*, 243 F.3d at 1375 n.3. The Federal Circuit thus acknowledged, as it was required to do, that those decisions continue to be binding as to the manner in which substantive rights of sureties under the doctrine of equitable subrogation are applied with respect to government contracts.

---

[12]Dicta has been defined by the Federal Circuit as "statements made by a court that are 'unnecessary to the decision in the case, and therefore not precedential (though [they] may be considered persuasive).'" *Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1307 (Fed. Cir. 2004) (quoting *Black's Law Dictionary* 1100 (7th ed. 1999)). The central holding of *Insurance Company of the West* is "that a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States." 243 F.3d at 1375; *see Insurance Co. of the West*, 55 Fed. Cl. at 535. The statements from the Federal Circuit's decision in *Insurance Company of the West* cited and relied upon by the government, however, discuss the possible substantive rights of sureties against the government once sovereign immunity has presumably been established. *See Insurance Co. of the West*, 55 Fed. Cl. at 535. Accordingly, the two statements from the Federal Circuit's opinion that are cited by the government "should be read in the light of the court's central holding and the controlling fact in that case," *F. Alderete Gen. Contractors, Inc. v. United States*, 715 F.2d 1476, 1479 (Fed. Cir. 1983), and "cannot be considered binding authority." *Co-Steel Raritan*, 357 F.3d at 1307 (quoting *Kastigar v. United States*, 406 U.S. 441, 454-55 (1972)).

In short, the Tucker Act supplies a waiver of sovereign immunity for a surety making a claim of equitable subrogation after having satisfied its obligations under a payment bond, just as the Tucker Act also serves that purpose for a surety who has satisfied a performance bond. For purposes of sovereign immunity there is no difference between the posture of the two sureties. Thus, this court has subject matter jurisdiction to entertain a claim by a surety who has satisfied all outstanding obligations to subcontractors on the payment bond.

2. *The parameters of Nova's claim.*

a. *Setoff.*

Had the government not made an improper payment to Eagle, there would have been $30,676.50 remaining in the contract balance due Eagle at the time the government was demanding that Eagle correct the painting that produced the "blotchy" appearance of the light tower.[13] Despite the fact that Nova may bring a claim against the government directly for the funds that should have been retained, its claim is inferior in priority to the government's claim for reimbursement of amounts due under the performance bond. In short, a surety's claim under a payment bond is inferior to any claim the government may hold for having completed the original contract. *See U.S. Fid. & Guar.*, 475 F.2d at 1383; *see also Dependable Ins.*, 846 F.2d at 67. Here, following the completion by Verrazano of the corrective contract in December 2004, the government paid Verrazano $23,898.50. Pl.'s Opp. Ex. I (Contracting Officer's Final Decision).[14] Consequently, the government presumptively would be entitled to the reimbursement for the Verrazano contract price, and therefore approximately $6,700 would remain as a contract balance for which Nova could assert a claim.

b. *Notice.*

The government has conceded that it improperly paid Eagle $25,303.50 in July 2003. Pl.'s Opp. Ex. E (Letter from O'Boyle to Connelly). If that payment were recognized as reducing the retainage under the government's contract with Eagle, a setoff for the government's superior claim for the Verrazano contract price would leave no outstanding balance, and no retainage

[13]When the Contracting Officer discovered "deficiencies in the exterior painting" of the light tower on June 20, 2003 and informed Eagle, Supp. Materials Ex. C (Cure Notice), the Coast Guard had paid Eagle $107,323.50 out of the total contract price of $138,000. *See supra*, at 4. Therefore, the government should have retained $30,676.50 had it not improperly paid Eagle $25,303.50 in July 2003. *Id.*

[14]In the Contracting Officer's Final Decision, issued on February 14, 2005, the Coast Guard sought reimbursement of $23,898.50 for the amount of the Verrazano contract and $3,720 for "A/E Inspection Costs." Pl.'s Opp. Ex. I (Contracting Officer's Final Decision). The government's entitlement to seek reimbursement for the $3,720 is beyond the scope of the jurisdictional motions now pending before the court.

would remain for Nova. Therefore, the effect of the government's improper payment to Eagle is material to Nova's claim.

Ordinarily, a surety must give notice to the government before the government is obliged to hold the remaining contract funds: "[N]otice [by the surety] that the contractor is in default and that the surety is invoking its rights to the remaining contract proceeds converts the government to a stakeholder with duties to the surety; the latter, by virtue of being subrogated to the rights of its principal, is then able to sue under the Tucker Act." *American Ins. Co. v. United States*, 62 Fed. Cl. 151, 155 (2004). "Absent such notice, those duties, and the concomitant ability to invoke this court's jurisdiction, generally do not attach." *Id*. (citing *Insurance Co. of the West*, 243 F.3d at 1371).

On its facts, the instant case shares some similarities to *Fireman's Fund Insurance*, where the plaintiff-surety requested that the government not make any further payments to the contractor due to the contractor's failure to satisfy its debts with its subcontractors. 909 F.2d at 496. Prior to receiving the surety's notice, however, the government had distributed over $500,000 in retained funds to the contractor. *Id*. The Federal Circuit determined that because the surety had fully satisfied all outstanding claims upon the payment bond, it had become subrogated to the contractor's rights against the government. *Id*. at 500 n.1 (citing *U.S. Fid. & Guar.*, 475 F.2d at 1384). Nevertheless, "these rights avail[ed the surety] little because the government ha[d] already paid [the contractor] what" the surety sought and thus the surety had to establish that it "ha[d] rights *of its own* against the government . . . to which it ha[d] succeeded, to recover the retainage already paid to [the contractor]." *Fireman's Fund*, 909 F.2d at 500 n.1. In the present case, as in *Fireman's Fund Insurance*, because no money remains in the contract balance following the government's partial satisfaction of its superior claim arising from payment on the Verrazano contract, Nova must establish that it has rights against the government respecting the improper payment to Eagle in July 2003.

In this case, prior to the improper payment to Eagle, Nova concededly did not give notice to the government that Eagle was in default of its obligations to pay Metron and Harsco, the subcontractors.[15] At that point, the government was obligated to protect the surety's interest only in the limited circumstances where Eagle's contract with the government required that the government retain funds or act reasonably to retain funds. Thus, in *National Surety Corp. v.*

---

[15]A surety is also not aided if the government receives notice but from a source other than the surety itself. *See Hartford Fire Ins. Co. v. United States*, 40 Fed. Cl. 520, 523 (1998). In *Fireman's Fund Insurance*, the Federal Circuit concluded that it was irrelevant if the government received notice from the subcontractors that they had not yet received payment from the contractor. 909 F.2d at 499. Similarly, the requirement that the surety provide notice cannot be excused even if the government itself discovers deficiencies in the quality and progress of the work through personal inspections. *Hartford Fire*, 40 Fed. Cl. at 523 (citing *Reliance Ins. Co. v. United States*, 27 Fed. Cl. 815, 827-28 (1993)).

*United States*, 118 F.3d 1542 (Fed. Cir. 1997), the Federal Circuit held that a surety could advance a claim against the government if the surety could show that the government departed from the terms of the bonded contract. *Id.* at 1547. In *National Surety*, a condition terminating an obligation on the part of the government to retain a percentage of the contract balance had not been satisfied, and, as a result, the obligation remained in place. *Id.*; *see also American Ins.*, 62 Fed. Cl. at 156 (agreeing with the plaintiff that "a surety may, without providing the requisite notice, recover against an obligee that impairs its suretyship status."); *Restatement (Third) of Suretyship and Guaranty* § 37.

The Prime Contract here incorporated by reference Federal Acquisition Regulation ("FAR") [48 C.F.R. §] 52.232-5, "Payments Under Fixed-Price Construction Contracts." Supp. Materials Ex. A § I.1. Under FAR 52.232-5(b), the government is to make progress payments to the contractor "as the work proceeds . . . on estimates of work accomplished which meets the standards of quality established under the contract, as approved by the Contracting Officer." Pursuant to FAR 52.232-5(e):

> If the Contracting Officer finds that . . . satisfactory progress has not been made, the Contracting Officer may retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved. When the work is substantially complete, the Contracting Officer may retain from previously withheld funds and future progress payments that amount the Contracting Officer considers adequate for protection of the Government and shall release to the contractor all the remaining withheld funds.

Therefore, in this instance, the Contracting Officer had discretion whether or not to make progress payments to Eagle as the prime contractor. That contractual interpretation might be thought fully to preclude Nova's claim and end the matter, but it does not.

In *American Insurance*, where the contracting officer also had discretion to retain a portion of the contract price, Judge Allegra of this court determined that "various cases suggest that if the [government] abused its discretion in making progress payments[,] that . . . could be viewed as an impairment of plaintiff's suretyship and give rise to damages." 62 Fed Cl. at 157 (citing *Argonaut Ins. Co. v. United States*, 434 F.2d 1362, 1368 (Ct. Cl. 1970)). Inevitably, in applying this variant of the *National Surety* exception to the notice rule, the issue before the court is whether the contracting officer reasonably exercised the discretion available to him in accordance with the applicable contractual provisions. *See American Ins.*, 62 Fed. Cl. at 158.

The determination of whether the Contracting Officer, Mr. O'Boyle, or the Coast Guard may have contravened FAR 52.232-5 by distributing $25,303.50 to Eagle in July 2003 is a question of fact. *See American Ins.*, 62 Fed Cl. at 158-59 (deciding the issue on summary judgment because there was no genuine dispute of material fact); *Westchester Fire Ins. Co. v. United States,* 52 Fed. Cl. 567, 577-78 (2002) (same). The Coast Guard conceded that this payment was made without authorization and was improper. Pl.'s Opp. Ex. E (Letter from

O'Boyle to Connelly). Nova has averred that this payment "was a breach by the Coast Guard of the payment terms of the Prime Contract" and that it "prejudiced Nova." Amended Compl. ¶¶ 27-28. Moreover, FAR 52.246-21, "Warranty of Construction," was also incorporated by reference into the Prime Contract. Supp. Materials Ex. A § I.1. In pertinent part, that portion of the FAR provided that Eagle warranted "that work performed under [the] contract conform[ed] to the contract requirements and is free of any defect in . . . workmanship performed by the Contractor or any subcontractor . . . for a period of 1 year from the date of final acceptance of the work." FAR 52.246-21(a), (b). The uncertainty as to the reasonableness of the Contracting Officer's action with respect to the progress payment made to Eagle in July 2003 is accentuated when one applies FAR 52.246-21 to the fact that on January 14, 2003, Mr. O'Boyle informed Eagle that the exterior painting had been performed satisfactorily, but six months later communicated to Eagle the there were deficiencies in the work performed. *See supra*, at 3. Based on the available record before the court, whether the Contracting Officer reasonably exercised his discretion is an unresolved question of fact.

In determining whether this court has subject matter jurisdiction, it must "draw all reasonable inferences in plaintiff's favor." *Henke*, 60 F.3d at 797. For the purposes of the pending motion, the court must therefore infer that the Contracting Officer acted unreasonably in his discretion, in contravention of provisions of the Prime Contract, when he did not retain a portion of the contract balance despite the unsatisfactory nature of Eagle's work on the exterior of the light tower. Accordingly, this court must deny the government's motion to dismiss for failure to state a claim upon which relief can be granted because Nova has stated a potentially viable claim against the government.

Despite the fact that this court has held that it has jurisdiction to decide the merits of Nova's claim, Nova will ultimately have the burden of proving that the Coast Guard and Contracting Officer did not comply with the provisions of the Prime Contract before Nova can recover the contract balance of approximately $6,700 that allegedly should have been retained by the government. *See Fireman's Fund*, 909 F.2d at 498 ("the government has considerable leeway in administering its contracts") (citing *Argonaut Ins.*, 434 F.2d at 1367).

## CONCLUSION

For the reasons set forth, the government's motions to dismiss are GRANTED IN PART and DENIED IN PART. The government's motions are GRANTED respecting plaintiff's claim with respect to its appeal of the Contracting Officer's Final Decision of February 14, 2005. That claim is hereby dismissed pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction. The government's motions to dismiss Nova's claim based on equitable subrogation are DENIED. For purposes of RCFC 12(b)(6), Nova has stated a viable claim under the Tucker Act and the doctrine of equitable subrogation, and this court has subject matter jurisdiction to entertain the merits of Nova's claim with respect to approximately $6,700 that allegedly should have remained in the contract retainage had the government not improperly paid the contractor in July 2003.

The government shall file an answer to the Amended Complaint on or before February 8, 2006. Thereafter, a status conference shall be held in this case on March 3, 2006, commencing at 2:00 p.m., by telephonic means.

IT IS SO ORDERED.

s/ Charles Lettow
Charles F. Lettow
Judge