# In the United States Court of Federal Claims

No. 04-1665C

(Filed: October 5, 2006)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * | |
| **NOVA CASUALTY COMPANY,** | Trial on stipulated facts; suretyship; performance and payment bonds under the Miller Act; renovation and repairs of a U.S. Coast Guard light tower; equitable subrogation; failure of government to adhere to the terms of a bonded contract |
| Plaintiff, | |
| v. | |
| **UNITED STATES,** | |
| Defendant. | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | |

Neil B. Connelly, White Plains, NY, for plaintiff.

Dawn S. Conrad, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Brian M. Simkin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Isaac Johnson, Jr., Attorney, Office of Procurement Law, United States Coast Guard, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This surety case is before the court for decision on facts stipulated by the parties. The United States Coast Guard ("Coast Guard") and Eagle Management Enterprises, Inc. ("Eagle") entered into a contract for the renovation of the Coney Island Light Tower in Brooklyn, New York. As a condition of the contract, Eagle obtained from plaintiff, Nova Casualty Company ("Nova"), performance and payment bonds for the benefit of the United States as obligee. As a result of alleged defaults on the part of Eagle respecting performance of the work and payment of its subcontractors, both the performance and payment bonds were invoked against Nova.

In its Amended Complaint, Nova sought to contest Eagle's obligations to the Coast Guard under the primary contract and to recover the contract balance the Coast Guard allegedly should

have retained. The government moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). On January 12, 2006, this court issued an opinion and order granting in part and denying in part the government's motions. *Nova Cas. Co. v. United States*, 69 Fed. Cl. 284, 292 (2006). Taking into account Nova's failure to act under the performance bond to undertake the work Eagle allegedly had not properly completed, this court granted the government's motion pursuant to RCFC 12(b)(1) to dismiss as beyond the court's subject matter jurisdiction Nova's contest of the contracting officer's decision regarding Eagle's default. Specifically, this court found that because Nova was not a "contractor" under the Contract Disputes Act, Pub. L. No. 95-563, 92 Stat. 2383 (1978) (codified at 41 U.S.C. §§ 601-613), its claim appealing the contracting officer's final decision did not fall under the grant to this court in that Act of jurisdiction to hear certain contractually related claims. *Nova Cas.*, 69 Fed. Cl. at 289-92. Respecting the payment bond, this court denied the government's motions to dismiss Nova's claim based on equitable subrogation arising under the bond, concluding that Nova had stated a valid claim under the Tucker Act, 28 U.S.C. § 1491(a)(1). *Nova Cas.*, 69 Fed. Cl. at 292-94. Having paid all outstanding claims of subcontractors under its payment bond with Eagle, Nova could invoke the Tucker Act as a jurisdictional predicate for a suit against the government because Nova stood in the shoes of Eagle for that purpose. *Id.* at 293-94. Thus, the court had subject matter jurisdiction to consider the merits of Nova's claim to the amount that allegedly "should have remained in the contract retainage had the government not improperly paid the contractor in July 2003." *Id.* at 299.

Thereafter, the parties agreed to resolve disputed issues of fact by way of a stipulation and to submit cross-motions for judgment predicated upon the stipulation. *See* Order of Apr. 24, 2006. The parties filed their Joint Stipulation of Material Facts ("Stip.") on May 19, 2006, and their cross-motions for judgment on June 30, 2006. Responses were filed by the government on July 28, 2006, and by Nova on July 31, 2006. The parties waived a hearing on the cross-motions and, in effect, the case has proceeded as a trial on stipulated facts.

For the reasons stated below, plaintiff's motion for judgment on stipulated facts is granted and defendant's motion for judgment on stipulated facts is denied.

## FACTS

On September 6, 2001, the Coast Guard and Eagle entered into Contract No. DTCGG1-01-C-3WK143, requiring Eagle to remove lead paint from, and to prepare and paint, all exterior and interior surfaces of the Coney Island Light Tower, and to make other minor repairs to the light tower's exterior in exchange for payment of $138,000. Stip. ¶¶ 1, 2. As a condition of the contract and pursuant to the Miller Act, Pub. L. No. 74-321, §1, 49 Stat. 793 (codified at 40 U.S.C. § 3131(b)) (formerly codified as 40 U.S.C. § 270a(a)), Eagle obtained performance and payment bonds, designated as Bonds No. 18271, from Nova in the amount of $138,000, each for the benefit of the United States as obligee. Stip. ¶ 3. In addition, under an earlier General Agreement of Indemnity, Eagle agreed, in the case of its breach or default under any contract for

which Nova issued its bonds, to assign its rights under such a contract to Nova and to allow Nova to be "subrogated to all the rights and properties of [Eagle] in such contract." Plaintiff's Opposition to Defendant's Motion to Dismiss ("Pl.'s Opp.") Ex. B (General Agreement of Indemnity (Dec. 27, 2000)).

Eagle commenced work on the light tower in September 2002, and based on invoices submitted in June, September, and November of 2002, the Coast Guard disbursed to Eagle three partial payments of $32,070, $28,500, and $37,450 for work performed under the contract. Stip. ¶¶ 10-14. On January 14, 2003, Mr. John O'Boyle, the Coast Guard Contracting Officer, advised Eagle that "the exterior painting work ha[d] been completed satisfactorily and [Eagle could] proceed with the removal of the scaffolding," although "interior work and outside concrete work [wa]s still outstanding." Stip. ¶ 18 (quoting Letter from John O'Boyle, Contracting Officer, Coast Guard, to Eagle (Jan. 14, 2003)).

Eagle had entered into two subcontracts with Metron Environmental Limited ("Metron") and Harsco Corporation ("Harsco") to perform work on the contract. Stip. ¶ 7. Late in 2002 and early in 2003, first Harsco and then Metron gave notice to the Coast Guard, Eagle, and Nova that Eagle had not paid those subcontractors for work they had completed on the project. Stip. ¶¶ 15, 20. In each instance, Eagle had applied for the pertinent progress amounts under the contract, certifying that "timely payments will be made from the proceeds of the payment covered by this certification in accordance with subcontracted agreements and the requirements of chapter 39 of Title 31, United States Code." Stip. ¶¶ 9, 11.

In response to Eagle's invoice of June 9, 2003 requesting a fourth partial payment under the contract, Mr. O'Boyle forwarded to the Coast Guard Finance Center ("Finance Center") a "Coast Guard Contract Payment Approval" form, approving a $25,303.50 payment to Eagle. Stip. ¶¶ 24, 26. Mr. O'Boyle noted on the form that the Coast Guard would retain $10,676.50 because of overbilling, incomplete work, and late performance. Stip. ¶ 26. Subsequently, during a site visit on June 20, 2003, Mr. O'Boyle noticed "blotches" on the exterior of the light tower, instead of a "solid white color," and advised Eagle's on-site representative of deficiencies in the painting. Stip. ¶ 27. Mr. O'Boyle notified Eagle in writing that he expected the contractor to "cure the[se] defects," providing a copy of the letter to Nova. Stip. ¶ 28.

In a further letter dated June 27, 2003, Mr. O'Boyle advised Eagle that due to the defective painting, the Coast Guard would reduce its payment on the fourth invoice to $9,303.50. Stip. ¶ 29. That same day Mr. O'Boyle sent the Coast Guard Finance Center an e-mail instructing it to reduce Eagle's payment by $16,000; he also sent the Finance Center by facsimile a revised copy of the "Coast Guard Contract Payment Approval" form, authorizing the reduced payment of $9,303.50. Stip. ¶ 30. Nonetheless, in July 2003, the Finance Center "mistakenly

made two payments to Eagle," one of $9,303.50 and another of $25,303.50, leaving a contract balance of $5,373. Stip. ¶ 31.[1]

Despite repeated efforts from June to December 2003 to have Eagle correct the painting defects, the Coast Guard had no success. Stip. ¶ 33; *see Nova Cas.* 69 Fed. Cl. at 286-87. Based on Eagle's failure to submit a "Proposed Schedule of Progress," to attend a scheduled meeting, and to respond to a "Cure Notice" issued in November 2003, Mr. O'Boyle issued a final decision on February 17, 2004, informing Eagle that its "failure to perform the corrective work [was] not excusable" and that the Coast Guard would "have the repairs performed by others with the resultant costs charged to [Eagle's] account and/or the account of [Nova]." Stip. ¶¶ 33-34; Pl.'s Opp. Ex. C (Contracting Officer's Final Decision (Feb. 17, 2004)). A copy of the final decision was also sent to Nova. Stip. ¶ 34.

Ultimately, the Coast Guard awarded a contract totaling $23,898.50 to Verrazano Contracting Company ("Verrazano") to repair the "blotches" on the light tower. Stip. ¶¶ 35-36. On October 8, 2004, the Contracting Officer issued a letter to Nova informing it of the contract with Verrazano. Stip. ¶ 38.

In a letter dated November 26, 2004, Mr. O'Boyle notified Mr. Neil Connelly, counsel for Nova, that the Finance Center had erroneously paid Eagle $25,303.50 in July 2003, without the Contracting Officer's authorization. Stip. ¶ 40. Mr. O'Boyle also stated that the Coast Guard would make a demand upon Eagle for $22,204.05 in excess procurement costs and that if Eagle failed to pay this amount, the Coast Guard would seek payment from Nova under the performance bond. Stip. ¶ 40.

On February 14, 2005, Mr. O'Boyle issued a second final decision, determining that Eagle "and/or Nova" were responsible for the $22,245.05 in excess procurement costs. Stip. ¶ 43. Neither Eagle nor Nova paid the requested amount. Stip. ¶¶ 35, 44.

Metron and Harsco pursued their claims against Eagle and Nova based on Eagle's failure to pay by filing suits in the U.S. District Court for the Eastern District of New York. Stip. ¶¶ 22, 25; *see United States ex rel. Metron Envtl. Ltd. v. Eagle Mgmt. Enters.,* No. CV-03-1952 (E.D.N.Y. filed Apr. 23, 2003); *United States ex rel. Harsco Corp. v. Nova Cas. Co.,* No. CV-03-2959 (E.D.N.Y. filed June 16, 2003). In April 2005, Nova settled Harsco's claim on the payment bond for $50,000, and in August 2005, Nova settled Metron's claim on the payment bond for $58,000. Stip. ¶¶ 46, 45. With these two payments, Nova satisfied all of the claims on the payment bond. Stip. ¶ 47.

---

[1]The Contracting Officer did not learn of this mistake until July 2004, a year after the erroneous payment was made. Stip. ¶ 31. Upon learning of the mistaken payments, the Contracting Officer sent Eagle a demand requesting return of $25,303.50, but Eagle did not respond. Stip. ¶ 35.

**ANALYSIS**

A. Liability

1. *Equitable subrogation.*

"A surety arrangement typically involves three parties: an obligee who has recourse against a surety (the secondary obligor) with respect to the obligation of another person (the principal obligor) to that obligee." *American Ins. Co. v. United States,* 62 Fed. Cl. 151, 154 (2004) (citing *Restatement (Third) of Suretyship & Guaranty* § 1(1)(a) (1996)). "A surety bond creates a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee (here, the government)." *Insurance Co. of the West v. United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001) (citing *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1160 (Fed. Cir. 1985)). If a surety to a bonded contract with the government is unable to establish a valid claim against the government based on privity of contract, the surety may invoke the doctrine of equitable subrogation. *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 136-37 & n.12 (1962). Under that doctrine, a surety that satisfies its payment bond is subrogated to the rights of the contractor. *United States Fid. & Guar. Co. v. United States,* 475 F.2d 1377, 1381-82 (Ct. Cl. 1973) (after satisfying the payment bond, the surety "is subrogated to the rights of the contractor who could sue the [g]overnment since it was in privity of contract with the United States").

2. *The notice requirement and the* National Surety *exception.*

Under an equitable subrogation theory applied to a payment bond, to recover funds that the government allegedly wrongfully released to a contractor, the surety ordinarily must have first given notice to the government of the contractor's default and the resulting claims. *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 498 (Fed. Cir. 1990) ("notice by the surety is essential before any governmental duty exists"); *National Am. Ins. Co. v. United States,* __ Fed. Cl. __, __, 2006 WL 2590391, at *5 (Fed. Cl. Sept. 6, 2006) ("[F]or the stakeholder duty to arise, the government must have 'due notice of the facts giving rise to an equitable right in the plaintiff surety company, and of the plaintiff's assertion of such a right.'") (quoting *Newark Ins. Co. v. United States*, 169 F.Supp. 955, 957 (Ct. Cl. 1959))); *accord Travelers Indem. Co. v. United States*, 72 Fed. Cl. 56, 67 (2006). Absent notice, the government, as obligee, generally owes no duty as a stakeholder to withhold progress payments under the contract. *Capitol Indem. Co. v. United States*, 71 Fed. Cl. 98, 103 (2006) (citing *Fireman's Fund*, 909 F.2d at 498; *Ransom v. United States*, 900 F.2d 242, 244-45 (Fed. Cir. 1990)); *American Ins.*, 62 Fed. Cl. at 155.

In *National Surety Corp. v. United States,* 118 F.3d 1542, 1547 (Fed. Cir. 1997), however, the Federal Circuit recognized and applied an exception to the notice requirement – under the exception, a surety may advance a claim against the government if it can demonstrate that the government violated the terms of a bonded contract to the detriment of the surety. The exception is based on the principle that the government owes the surety a duty "to administer the

contract . . . in a way that does not materially increase the risk that was assumed by the surety when the contract was bonded." *Id*. at 1546 (citing *United States Fid. & Guar.*, 475 F.2d at 1384); *American Ins.*, 62 Fed. Cl. at 157 ("'[T]he [g]overnment has a duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract.'") (quoting *Argonaut Ins. Co.* v. *United States*, 434 F.2d 1362, 1368 (Ct. Cl. 1970)).

As both parties acknowledge, by resolving the claims of subcontractors Harsco and Metron, Nova has satisfied the threshold requirement for its claim to the $25,303.50 that the Coast Guard mistakenly disbursed to Eagle in July 2003. *See* Stip. ¶ 47. Prior to the erroneous payment in July 2003, however, Nova had not provided notice to the Coast Guard that Eagle was not paying its subcontractors, that Eagle was in default, or that the Coast Guard should withhold funds due to Eagle under the contract. Stip. ¶ 32; *Nova Cas.*, 69 Fed. Cl. at 297. That the government's Contracting Officer, Mr. O'Boyle, had independently received such notice directly from Harsco and Metron does not affect this analysis. *See Fireman's Fund*, 909 F.2d at 499.

Relying chiefly on *Fireman's Fund*, the government contends that Nova's failure to give notice to the government is fatal to Nova's claim. Def.'s Mot. for Judgment at 8-11. Nova, relying on the standard set forth in *Campbell Plastics Eng'g & Mfg., Inc. v. Brownlee,* 389 F.3d 1243 (Fed. Cir. 2004), responds that the Coast Guard's violation of a provision in the Eagle-Coast Guard contract constitutes an abuse of discretion. Pl.'s Cross-Mot. for Judgment at 8. Specifically, Nova refers to Federal Acquisition Regulation ("FAR") [48 C.F.R.] § 52.232-5, "Payments Under Fixed-Price Construction Contracts," which the contract incorporated by reference. Joint Filing of Supp. Materials Ex. A § I.1 (filed Aug. 15, 2005); *see also* 48 C.F.R. § 52.232-5 (2001). Under FAR § 52.232-5(b), the government must make progress payments to the contractor "as the work proceeds . . . on estimates of work accomplished which meets the standards of quality established under the contract, *as approved by the Contracting Officer*." 48 C.F.R. § 52.232-5(b) (2001) (emphasis added).[2] Nova avers that because the government concedes that the Coast Guard Finance Center's $25,303.50 payment to Eagle in July 2003 was erroneous, Nova is entitled to a damages award equal to the erroneous progress payment, plus any remaining contract balance. Pl.'s Cross-Mot. for Judgment at 6-8.

The government's categorical reliance on the notice requirement as explicated in *Fireman's Fund* does not fully take account of *National Surety* which explained that notice may be excused where the government violates the terms of the bonded contract. *National Sur.,* 118 F.3d at 1547; *see also Nova Cas.*, 69 Fed. Cl. at 297. In *National Surety*, the government violated a mandatory provision of the contract that required it to retain ten percent of the progress payments until a particular diagram had been approved. *National Sur.,* 118 F.3d at 1543, 1547. The Federal Circuit contrasted the facts in *National Surety* to those in *Fireman's Fund* where a

---

[2]The current version of FAR § 52.232-5(b) is identical to the version in effect in 2001 which was incorporated into the Eagle-Coast Guard contract, signed September 6, 2001. *Compare* 48 C.F.R. § 52.232-5(b) (2006) *with* 48 C.F.R. § 52.232-5(b) (2001).

contract retainage provision gave the government discretion to make certain payments without retaining a fixed percentage. *National Sur.*, 118 F.3d at 1547. Noting that the government had violated the mandatory retainage provision in *National Surety*, the court further explained: "When the contractor abandon[s] performance before completion . . . and the government ha[s] knowledge of the default . . . and so inform[s] the surety . . . , *Fireman's Fund* does not impose a further requirement that the surety notify the government that 'the principal has defaulted.'" *Id.*

In this case, the Coast Guard contravened FAR § 52.232-5(b), as incorporated into the contract. Just as the minimum retainages were mandatory in *National Surety*, the requirement in FAR § 52.232-5(b) that the contracting officer approve all progress payments was mandatory here. 48 C.F.R. § 52.232-5(b) (2001); *see National Sur.*, 118 F.3d at 1547. In late June 2003, Mr. O'Boyle explicitly rescinded his earlier approval of a $25,303.50 payment to Eagle. Stip. ¶¶ 26, 30. On June 27, 2003, he sent an e-mail to the Finance Center informing it of his decision, and he confirmed that rescission with a facsimile and letter reducing the payment to Eagle to $9,303.50. Stip. ¶ 30. Nonetheless, without Mr. Boyle's approval, the Finance Center made the $25,303.50 payment to Eagle in violation of FAR § 52.232-5(b). Stip. ¶ 31.

The distinctions that the Federal Circuit drew between the facts in *National Surety* and *Fireman's Fund* dictate that *National Surety's* exception to the notice requirement controls under the circumstances of this case. Here, Eagle had "abandoned performance before completion," the Coast Guard "had knowledge of the default," and the Coast Guard "had informed the surety." Stip. ¶¶ 34, 38, 40, 43; Pl.'s Opp. Ex. I (Contracting Officer's Final Decision (Feb. 14, 2005)); *see National Sur.,* 118 F.3d at 1547 (noting the circumstances under which the notice requirement is waived). Under these facts, coupled with the Coast Guard Finance Center's contravention of FAR § 52.232-5(b), the *National Surety* exception applies to excuse Nova's obligation to notify the government that Eagle had defaulted. *See National Sur.,* 118 F.3d at 1547.

3. *Application of the* National Surety *exception.*

In analyzing the *National Surety* exception to the notice requirement for cases in which the government has violated the underlying contract*,* the government focuses on FAR § 52.232-5(e), which provides that "[i]f the Contracting Officer finds that . . . satisfactory progress has not been made, the Contracting Officer *may* retain a maximum of 10 percent of the amount of the payment until satisfactory progress is achieved." Def.'s Mot. for Judgment at 20-21 (emphasis added); *see* 48 C.F.R. § 52.232-5(e) (2001). As the government notes, Def.'s Mot. for Judgment at 20, and as Nova appears to concede, *see* Pl.'s Cross-Mot. for Judgment; Pl.'s Reply in Further Support of its Cross-Motion for Judgment ("Pl.'s Reply"), Mr. O'Boyle, the Contracting Officer, had discretion to disburse progress payments to Eagle. *See also Nova Cas.*, 69 Fed. Cl. at 298. The real issue, however, is not the Contracting Officer's discretion because he exercised that discretion to rescind approval of a progress payment to Eagle. Instead, the pertinent question is the legal effect under *National Surety* of the Finance Center's contravention of FAR § 52.232-

5(b), which required that progress payments to Eagle be approved by Mr. O'Boyle.[3] To the extent that the government appears to view *National Surety* as excusing the notice requirement only if the government violates a contract's mandatory retainage provision, *see* Def.'s Mot. for Judgment at 20-21, its reading of that case is too narrow.

To be sure, *National Surety* and *Fireman's Fund* both dealt with retainage provisions in a contract, and the court in *National Surety* distinguished the two cases by noting that one provision was mandatory, the other discretionary. *National Sur.,* 118 F.3d at 1547; *Fireman's Fund,* 909 F.2d at 498. In establishing the appropriate legal principles to apply, however, both cases more broadly focused on the central importance of adherence to the contract's terms in a surety arrangement. In *National Surety*, the court explained the rationale for ensuring that the government abides by the terms of the underlying contract:

> Surety bonds are integral to the government contracting process, for through the surety system the government enters into arrangements with reduced risk, by drawing on the responsibility and resources of the surety. Contract terms that provide security for the bonded performance can not be ignored, waived, or modified without consideration of the surety's interests.

*National Sur.,* 118 F.3d at 1547. *Fireman's Fund*, although establishing the requirement that the surety give notice to the government, also focused on the terms of the contract:

---

[3]The government admits that the $25,303.50 payment in July 2003 violated FAR § 52.232-5(b), but it asserts that the payment was not an abuse of discretion because it was not "contrary to the Coast Guard's interests." Def.'s Mot. for Judgment at 18. The government argues that the payment to Eagle "could have been used" to complete the project. *Id*. Citing *United Pacific Ins. Co. v. United States*, 16 Cl. Ct. 555 (1989), it avers that consideration of whether the government violated the bonded contract is primarily an inquiry into whether that violation is contrary to the *government's* interests. Def.'s Mot. for Judgment at 18. The government's hypothetical as to what Eagle "could have" done with the payment is rebutted by the reality that Eagle did not use the payment to complete the project, nor did it return the erroneous payment as the Contracting Officer demanded in July 2004. Stip. ¶ 35. Moreover, although the court in *United Pacific* noted that the government "failed to protect not only the interests of the surety, but its own," *United Pacific*, 16 Cl. Ct. at 560, that language does not suggest that harm to the government is the *primary* concern in analyzing the government's violation of a contract. Moreover, *United Pacific* pre-dates *National Surety* which stressed the effect the government's contravention of a contract can have on the surety. *National Sur.*, 118 F.3d at 1546 (noting the government's duty to administer the contract "in a way that does not materially increase [the surety's risk]") (citing *United States Fid. & Guar.*, 475 F.2d at 1384). In this instance, there is no doubt that the Finance Center's actions contrary to the Contracting Officer's explicit instructions materially increased Nova Casualty's risk under its surety agreement. *See infra*, at 9.

> "[i]t is well-settled in many jurisdictions that if the obligee departed from or altered the contractual provisions relating to payments and/or the security of retained funds, a surety is discharged from its obligations only to the extent it can show injury, loss, or prejudice." . . . Thus, for the rule to operate to [the surety's] benefit, *the government must have departed from the terms of the bonded contract*.

*Fireman's Fund*, 909 F.2d at 497 (quoting *Fireman's Fund Ins. Co. v. United States,* 15 Ct. Cl. 225, 230 (1988) (first alteration in original) (emphasis added)); *see also Balboa*, 775 F.2d at 1165 (describing the trial court's task as determining whether a progress payment was "a reasonable exercise of the discretion conferred on the contracting agency *by the terms of the contract and the applicable law and regulations*") (emphasis added). In a similar vein, the court in *Fireman's Fund* stated that "[o]nly the contract should limit the government's flexibility in resolving payment disputes." 909 F.2d at 499.

Decisions of this court have also applied *National Surety* and *Fireman's Fund* with a focus on the obligations established by the terms of the contract. In *International Fidelity Ins. Co. v. United States*, 41 Fed. Cl. 706 (1998), the court explained: "[I]n *National Surety,* the language of the contract was found to be dispositive, and in *Fireman's Fund,* the court stated that '[o]nly the contract should limit the government's flexibility.'" 41 Fed. Cl. at 714 (citations omitted). In *Westchester Fire Ins. Co. v. United States*, 52 Fed. Cl. 567 (2002), the court cited *National Surety* and *Fireman's Fund* for the proposition that derogation from the terms of the bonded contract discharged the surety from its bond obligations. 52 Fed. Cl. at 579. The court understood *Fireman's Fund* to mean that a surety may have a valid claim against the government "if the [g]overnment, in disbursing funds to the contractor, derogated from the governing contractual provisions and thereby caused injury to the surety." *Id.* at 576. Similarly, in *Lumbermens Mutual Cas. v. United States,* 67 Fed. Cl. 253 (2005), citing *National Surety*, the court opined that to recover absent notice, the surety "must show that the Government departed from the terms of its contract." 67 Fed. Cl. at 255.

The resulting question is whether the Coast Guard's erroneous $25,303.50 payment to Eagle in July 2003 constituted an impairment of Nova's suretyship status. *See National Sur.,* 118 F.3d at 1547; *see also American Ins.*, 62 Fed. Cl. at 156 ("a surety may, without providing the requisite notice, recover against an obligee that impairs its suretyship status"); *Restatement (Third) of Suretyship and Guaranty* § 37. The contracting officer, Mr. O'Boyle, had discretion to issue the progress payment to Eagle, *American Ins.*, 62 Fed. Cl. at 158 (noting that "numerous cases have recognized . . . [the] contracting officer's [broad] discretion . . . unless restricted by the contract"), but he exercised that discretion specifically to instruct the Finance Center not to make the payment. Stip. ¶¶ 26, 30. Having been so instructed, the Coast Guard Finance Center had no discretion under FAR § 52.232-5(b) to disburse the $25,303.50 payment contrary to the Contracting Officer's instruction. That mistake reduced the funds available to remedy Eagle's defaults and accordingly increased Nova's suretyship obligations. Thus, the Finance Center's

erroneous disbursement to Eagle in July 2003 makes the government liable to Nova for the losses it sustained. *See National Sur.*, 118 F.3d at 1547.[4]

B. Damages

"It is of course almost axiomatic that any change or modification of the construction contract which materially increases a compensated surety's risk discharges the obligation." *National Sur.,* 118 F.3d at 1547 (quoting *Trinity Universal Ins. Co. v. Gould,* 258 F.2d 883, 885 (10th Cir. 1958). The surety is not necessarily entitled to recover the full amount of the contract balance, but under the rule of *pro tanto* discharge it may recover actual damages: "[I]f the [government] departed from or altered the contractual provisions relating to payments and/or the security of retained funds, a surety is discharged to the extent it can show injury, loss, or prejudice." *Fireman's Fund*, 909 F.2d at 497; *see also National Sur.*, 118 F.3d at 1548 ("the surety's recovery should be measured by its actual damages"). As explained in *Preferred National Ins. Co. v. United States,* 54 Fed. Cl. 600 (2002), a surety will be completely discharged

---

[4]*National Surety* and *Fireman's Fund* indicate that a violation of the contract by the government that impairs the surety's position is dispositive. *See supra* at 8-9; *see also United States Fid. & Guar.*, 676 F.2d at 630 ("a proven violation of an applicable statute or regulation incorporated into a contract may be enough to show that the conduct was arbitrary and capricious"); *International Fid. Ins.*, 41 Fed. Cl. at 714 ("in *National Surety*, the language of the contract was found to be dispositive"). Instructively, in *National Surety* the Federal Circuit did not apply the eight-factor test for abuse of discretion set out in *Balboa*, 775 F.2d at 1164-65, but rather deemed the government's violation of the contract itself to be a sufficient ground for recovery. *See National Surety*, 118 F.3d at 1547. As the Federal Circuit noted:

> The government's failure to retain the required sums during performance of the [contractor's] contract was a change in the terms from those on which the surety provided its bonds. When [the surety] completed the contract in accordance with its performance bond, it was entitled to the benefit of the contractually-required retainage. The government's improper release of this security does not avoid liability to the surety for losses thereby sustained.

*Id*.

Although Nova relies on a four-factor test explicated in *Campbell Plastics* and the government urges the application of the eight-factor test set out in *Balboa*, both tests include a factor relating to whether the government has violated a statute or regulation. *See Campbell Plastics,* 389 F.3d at 1250 ("whether the official violated a statute or regulation"); *Balboa*, 775 F.2d at 1165 ("[w]hether the [g]overnment's action violates one of its own statutes or regulations"). In accord with *National Surety*, *Fireman's Fund*, and *United States Fidelity & Guaranty*, the Coast Guard Finance Center's violation of FAR § 52.232-5(b) is dispositive in this instance. Alternatively, the application of the *Campbell Plastics* or *Balboa* tests would also lead to the same conclusion, *i.e.*, that the government abused its discretion in disbursing the $25,303.50 progress payment to Eagle, rendering the government liable to Nova for damages.

from its obligations where the alteration fundamentally alters the risks imposed on the surety, but where the alteration is not fundamental, the surety's damages are limited to the loss "due to the modification." 54 Fed. Cl. at 605 (quoting *National Sur.*, 118 F.3d at 1544); *see also Restatement (Third) of Suretyship and Guaranty* § 37 cmt. d ("Subsection (4) gives the secondary obligor a claim against the obligee to the extent that the impairment of the suretyship status would have discharged the secondary obligor.").

Nova has amply demonstrated that it suffered a loss as a result of the Coast Guard's erroneous disbursement of $25,303.50 to Eagle. Had the Coast Guard not disbursed the payment to Eagle, the remaining contract balance would have been $30,676.50.[5] The government resists this conclusion by again focusing on FAR § 52.232-5(e), the retainage provision, rather than FAR § 52.232-5(b), providing that progress payments shall be made as approved by the Contracting Officer. The government is correct that Nova assumed the risk inherent in the discretionary retainage provision of FAR § 52.232-5(e), but Nova did not assume the risk that the Coast Guard would pay Eagle without the Contracting Officer's approval, in contravention of FAR § 52.232-5(b).[6]

A surety's claim under a payment bond, however, is inferior to the government's claims under the performance bond. In *United States Fidelity & Guaranty*, 475 F.2d at 1382, the court stated that a surety that performed under a payment bond "[did] not have priority when the United States [wa]s asserting a[n] . . . obligation owed by the prime contractor." *See also National Fire Ins. Co. of Hartford v. Fortune Constr. Co.*, 320 F.3d 1260, 1270-72 (11th Cir. 2003) (distinguishing between the relative priorities of a surety's right to subrogation under performance and payment bonds) (citing *Dependable Ins. Co. v. United States*, 846 F.2d 65, 67 (Fed. Cir. 1988)). In this case, the parties have stipulated that Nova is responsible as Eagle's surety for paying a net amount of $22,245.05 to correct Eagle's allegedly defective work. Stip. ¶ 43; Pl.'s Opp. Ex. I (Contracting Officer's Final Decision (Feb. 14, 2005)). The government is entitled to reimbursement for that amount. *See United States Fid. & Guar.,* 475 F.2d at 1382.

---

[5]Under the $138,000 contract, the Coast Guard's first three payments to Eagle totaled $98,020. *See* Stip. ¶¶ 10, 12, 14. Had the Finance Center followed Mr. O'Boyle's instructions that the fourth progress payment was to be reduced from $25,303.50 to $9,303.50, Stip. ¶¶ 30-31, the remaining contract balance would have been $30,676.50. That is, $138,000 - ($98,020 + $9,303.50) = $30,676.50.

[6]Under *National Surety*, in determining whether unauthorized payments to the contractor increased the surety's risk, a court should consider what the contractor did with the funds disbursed to it. If the contractor expended the funds on the contract, the released funds might actually have reduced the surety's risk. *See National Sur.*, 118 F.3d at 1548. In this case, however, Eagle's last communication with the contracting officer was in late October 2003, Stip. ¶ 33; Pl.'s Opp. Ex. C (Contracting Officer's Final Decision (Feb. 17, 2004)) ¶ 3, and there is no evidence that Eagle spent any of the $25,303.50 payment on the contract.

Subtracting $22,245.05 from the mistaken payment of $25,303.50 leaves $3,058.45. Nova is entitled to damages in the amount of $3,058.45.[7]

**CONCLUSION**

For the reasons set forth, Nova's motion for judgment on stipulated facts is GRANTED. Nova is entitled to the contract balance that the government should have retained, minus the set-off to which the government is entitled for reimbursement of the Verrazano contract price. Therefore, Nova is awarded damages in the amount of $3,058.45. The Clerk shall enter judgment in favor of Nova for this amount. The government's motion for judgment on stipulated facts is correspondingly DENIED.

Nova also is awarded costs.

IT IS SO ORDERED.

s/ Charles Lettow
Charles F. Lettow
Judge

[7]In its Cross-Motion for Judgment Upon Stipulated Facts, Nova also alleges that the contracting officer's determination that Eagle's painting job was defective was an abuse of discretion. Pl.'s Cross-Mot. for Judgment at 12, 15. Specifically, Nova claims that the Contracting Officer, Mr. O'Boyle, acted arbitrarily in concluding that the two-tone appearance of the light tower was the result of Eagle's defective workmanship. *Id.* at 15. As this court has previously ruled, however, Nova lacks standing to appeal the Contracting Officer's final decision of February 14, 2005. *Nova Cas.*, 69 Fed. Cl. at 289-92; *see Admiralty Constr. Inc. by Nat'l Am. Ins. Co. v. Dalton*, 156 F.3d 1217, 1221-22 (Fed. Cir. 1998). Having never entered into a takeover agreement or other contract with the Coast Guard to complete the work on the light tower, Nova cannot be considered a "contractor" under Section 2(4) of the Contract Disputes Act, 41 U.S.C. § 601(4). *Nova Cas.*, 69 Fed. Cl. at 290. As such, Nova lacks standing to contest the Contracting Officer's decision, and this court has no jurisdiction over any such claim. *Id.* at 292.